## JORDAN et al. v. COOK.

1. Under the rulings of this court, assignments of error that are not discussed or otherwise insisted upon in the brief of the attorney for the plaintiff in error will be considered as abandoned.
2. The petition as amended alleged a cause of action.
3. The evidence was sufficient to support the verdict in favor of the plaintiff.

No. 4130. SEPTEMBER 30, 1924.

Equitable petition. Before Judge Hardeman. Telfair superior court. December 8, 1923.

*Hal Lawson, Max E. Land,* and *J. S. Adams,* for plaintiffs in error.

*E. D. Graham* and *W. S. Mann,* contra.

ATKINSON, J. On February 28, 1921, J. M. Cook instituted an equitable action against J. H. Jordan and H. G. Stephens. The defendants filed a demurrer to the petition, and subsequently a plea to the jurisdiction of the court. On October 21, 1921, the court overruled the demurrer, and directed a verdict against the defendants on their plea to the jurisdiction. Exceptions pendente lite were duly filed, assigning error on both judgments. The case proceeded to trial on its merits, and on October 16, 1923, a verdict was returned for the plaintiff. The defendants made a motion for a new trial, based on the usual general grounds, which was subsequently amended by specifying the reasons upon which it was insisted that the verdict was contrary to the law and the evidence. The motion for new trial was overruled, and the movants excepted. Error was also assigned on the exceptions pendente lite. In the brief of the attorneys for the plaintiff in error the assignment of error upon the judgment directing the verdict against the defendants on the plea to the jurisdiction was not discussed or otherwise insisted upon. The only grounds of demurrer that were discussed and insisted upon in the brief of the attorneys for the plaintiff in error related to questions that were also urged and discussed with reference to the amendment to the motion for new trial, and the assignments of error on the judgment overruling the demurrer and the judgment refusing a new trial were considered together.

1. The ruling announced in the first headnote does not require elaboration.

2. The original petition alleged, among other things, substantially the following: The plaintiff owned and operated a hardware store at Milan, Georgia. In November, 1920, plaintiff and defendants formed a partnership called the Cook Hardware Company, for the purpose of owning and operating the store on the basis of a one-third interest to each of the named persons. It was agreed between the parties that the defendant Jordan should have active control of the business, and that plaintiff was not required to participate in the management and control of the business. As

a part of the agreement plaintiff sold the store consisting of the stock of goods and fixtures to the partnership for $15,668.67, and possession of the property was delivered by plaintiff to the partnership on January 1, 1921. The contract of sale provided that each of the defendants should execute to plaintiff his individual note payable 12 months from January 1, 1921, for one third of the price, and that the note of Jordan should be indorsed by his codefendant, Stephens. After the partnership had taken possession of the property and operated the store for a period of 2 months, the defendants refused to execute the notes to plaintiff, or pay for their interests, and were about to abandon the business. An amendment to the petition alleged that both defendants had since abandoned management and control of the business, and refused to select any other person to carry it on. Other allegations stated in greater detail matters that were covered by the allegations of the original petition. The petition as amended alleged a complete contract between the parties to form a partnership; a sale by the plaintiff of the goods and fixtures to the partnership; delivery of the property and acceptance in terms of the contract; abandonment by the defendants of the partnership enterprise after the partnership business had been carried on by them for the space of two months; and the refusal by the defendants to execute the notes, or to pay for their interests in the property. The petition alleged a cause of action, and was not subject to general demurrer on the grounds (a) That it appeared that the suit was based upon contract in parol for the sale of goods exceeding $50 in value. (b) That the allegations showed only a tentative agreement to make a contract. (c) That no partnership could legally exist between plaintiff and defendants until the contract was actually consummated. (d) That there could be no legal sale of the stock of goods and fixtures until the execution of the notes.

3. Was the verdict authorized by the evidence? The plaintiff as a witness in his own behalf testified in part as follows: "I am acquainted with Mr. Julian H. Jordan and Mr. H. G. Stephens, and I was in partnership with them in the retail hardware business at Milan, Georgia. I had been in the retail hardware business there before that time. The first conversation I had with these defendants about the formation of this partnership was sometime in November, 1920. Mr. Jordan first came, . . and he asked

me if I would sell the business, and I told him I would. . .
Later Mr. Stephens and Mr. Jordan came by here and got Mr.
C. M. Tillman, who was a friend of theirs. . . Mr. Stephens
said he came over there to figure with me to buy an interest for
Mr. Jordan, that Mr. Jordan was a good man, and he wanted to
help him get in business. I told Mr. Stephens, 'I do not know any-
thing about Mr. Jordan. . . I do know you by reputation. I
will make you a proposition. I will sell you a one-third interest,
and I will sell Mr. Jordan a one-third interest, and I will retain
a one-third interest and let Mr. Jordan manage the business.' . .
They agreed to that. They came back and said, 'We want one
more thing added to this. We want you to agree to sell us your
one-third interest at the end of twelve months, with eight per
cent. added.' I said, 'I will not do that. I will sell you my one-
third interest at the end of twelve months, with profits.' They
agreed to that. Mr. Jordan said he had a home in Dublin, had
an equity in it; he was going to sell that and put that money in it.
Mr. Stephens said he had no money then, he would give me his
note due in the fall; and I agreed to that. We were to take an
inventory the first of January. . . We could not arrive at the
price until the inventory was taken; if anything came up that we
could not agree on a price, Mr. Stephens agreed to let Mr. Till-
man arbitrate that. Mr. Tillman was to settle the matter. We
were to take an inventory of the stock to arrive at the price; they
were to take it at my cost price; and if anything had reduced,
any articles had gone off at that time, we were to agree on that, and
I was to take it off; and if any articles had gone above the cost
price, they were to take them at the cost price. This inventory
was to fix the price they were to pay me. If there was a dispute
about the price of any article, Mr. Tillman was to fix that. . .
No dispute whatever arose between us as to the price of any article.
. . Mr. Jordan was to take the inventory, and it [the business]
was to be turned over to Mr. Jordan to manage. . . The in-
ventory totaled over fifteen thousand dollars. . . The inventory
was $15,668.67, and it was o.k.'d by Mr. Jordan, 1/31/1920. . .

"J. H. Jordan was to have the management of the partnership
business of Stephens, Cook and Jordan, and Mr. Jordan took pos-
session of it immediately after we got through with the inventory,
and he ran it in January and February and left there the first of

March. . . During that time I had nothing to do with the management of the business, had nothing at all to do with buying the stock or settlement for stock. . . Mr. Jordan bought goods for the partnership during the time he ran it. . . Mr. Jordan did not use the same books that I was using, he put in a new set of books entirely for the partnership. . . He deposited in the Bank of Milan as Cook Hardware No. 2 by J. H. Jordan; this is his deposit book that he opened up at the Bank of Milan. . . I think this is the statement he made of the first month's business, may be both of them; mailed Mr. Stephens one and gave me one. . . The name of the business was Cook Hardware Co. He asked me to let it remain that way. . . At that time [the time Jordan was abandoning the business] Mr. Jordan did not claim there was no Cook Hardware Co. formed. He tried to get Mr. Stephens to send another man out of his place at Dublin down there to manage the business, let him retain his one-third interest and move to Cordele, and audit the business once a month. Mr. Stephens came down there to see me along the latter part of February, I don't remember the date; and we sat out there in his car and talked the proposition over a good long time. He left me and was to come back the following Friday. . . He was going to see if he could not persuade Mr. Jordan to stay there and run the business; [he said] 'go right ahead; that is all right. I am going to carry out my contract with you.' . . On Friday Mr. Stephens wrote me. . . Mr. Stephens would not come back down there, and I called him up over the telephone, and he finally agreed to meet me in Eastman. We went up there and talked the proposition over. He would not talk any way at all then, just flew right off and would not do any way. . . Mr. Stephens . . then refused to carry out his contract; that was the first time that he had ever refused to carry out his contract. . . Mr. Stephens was not down there at any time while we were taking the inventory, but he knew Mr. Jordan was taking the inventory as his agent; he sent Mr. Jordan down there to take the stock; we agreed that Mr. Jordan was to come there and take this inventory, and we also agreed on Mr. Jordan's salary that day; my recollection is we agreed that his salary would be $125 a month, and he collected his salary. During the time Mr. Jordan was there Mr. Stephens came there; he made no objections at all to Mr. Jordan going ahead

with the business like we all had agreed, nor did he at that time raise any contention that he was not a member of the partnership or that he was not bound by the sale.　. ."

On cross-examination:

"Mr. Stephens and Mr. Tillman came down with Mr. Jordan, and at that time negotiations were had relative to the formation of a partnership.　.　.　Mr. Jordan was to buy a one-third interest as soon as he could sell his home in Dublin; he was going to get what money he could out of that, and Mr. Stephens was to indorse his paper, and Mr. Stephens was to give me his note payable in the fall for his one-third interest. Mr. Jordan did not say how much money he would put in; he said he had an equity in a home, and asked me not to force him to sell it at forced sale; he was to put in what money he got out of it, and I was expecting that to be done in a reasonable time. We were to go ahead and sign up. Mr. Stephens was to sign Mr. Jordan's paper.　.　.　There was not any specified time in which Mr. Stephens was to indorse Mr. Jordan's note for his one-third interest. Mr. Stephens was to stand good for the entire amount of Mr. Jordan's one-third interest. Mr. Stephens was to back up Mr. Jordan and sign the note with him. Mr. Jordan, Mr. Stephens, and I were to be in the partnership. It was not contemplated that two would be in the partnership; all three were to be together.　.　.　Mr. Stephens was not there when this inventory was taken. I don't know whether he ever saw this inventory or not. I never did present him with it. Mr. Stephens agreed to take the interest in the business; there was not anything said about how much the inventory would run, he agreed to take it at whatever the inventory did run.　.　.　Mr. Stephens did not know what the figures were when he agreed to that. The day Mr. Stephens was over there he said to me that he would carry out his contract regardless of Mr. Jordan's conduct; he did not come right out and say fifteen thousand and some odd dollars, but said he would carry out his contract.　.　.　From the time I saw Mr. Stephens in November and we agreed on the contract which I have outlined, I did not see him any more until after the inventory was taken, when he came down there on the one occasion that I mentioned on the direct examination.　.　.　At the time the partnership agreement was made it was also agreed as a

part of the agreement that this stock of goods was to be purchased from me. . ."

The amendment to the motion for new trial was: "Because movants contend that the verdict and judgment is contrary to the evidence in said case and without evidence to support it, in this, to wit: In order for the plaintiff to recover of the defendant, movants contend that it was necessary for the plaintiff to prove [1] that both J. H. Jordan and H. G. Stephens made a binding contract to purchase each a one-third interest in the stock of goods involved in the case; [2] that the price was agreed upon by each of the defendants and by the plaintiffs, and that the stock of goods was delivered to and accepted by each one of the said defendants. The plaintiff submitted evidence which authorized the jury to find: that no price was agreed upon for the stock, except that J. H. Jordan was to take an inventory of the stock of goods at their cost price, i. e. at the price that J. M. Cook had bought them; that if the parties did not agree to that price on any of the articles in the stock, they would endeavor to agree on the value of such article, or, failing therein, that one Tillman should fix the price; that J. H. Jordan did take such inventory and agreed to the price as shown, and that J. H. Jordan went in possession of the stock for the partnership; that J. H. Jordan was the agent of the said H. G. Stephens in the taking of the inventory aforesaid. Movants [defendants] contended [a] that there was no evidence that H. G. Stephens ever authorized J. H. Jordan to fix for him, the said Stephens, the price of any article whatever in the inventory, [b] nor any evidence that Stephens was ever advised of the total amount of the said inventory, [c] or in any way consented to pay any specified amount as the purchase-price of a one-third interest in said stock of goods, [d] or received or accepted said stock of goods or any part thereof, [e] but on the other hand there was the direct evidence of said H. G. Stephens that he never made said J. H. Jordan his agent to agree upon the price of the goods, or to accept delivery for the said Stephens, and that the said Stephens had never seen an inventory of the stock, nor had he accepted delivery of the stock or any part thereof. Movants contend [3] that plaintiff's case rested entirely upon the question as to whether there had been a sale by him of the stock of goods herein involved, and that there was no evidence of

two essentials especially, to wit: [f] there was no evidence that the vendor and the vendees ever agreed upon and fixed the purchase-price, [g] and there was proof that the sale was to be a sale on credit, but the length of the credit was never agreed upon; and movants contend, that, as all three parties must have consented to the sale and its terms, and there must have been delivery made and accepted by all three parties to the alleged sale, the evidence failed to show that the price to be paid had ever been fixed and agreed upon, and failed to show the time to which the credit for the price was to be extended, and failed to show delivery of the goods; and for these reasons movants contend that [the] verdict and judgment in said case were contrary to the evidence and without evidence to support them."

The alleged agreement was twofold: (a) To form a partnership between Cook, Jordan, and Stephens. (b) Sale by Cook to Jordan and Stephens of a one-third interest to each in the store and fixtures to be operated by the firm. The plaintiff's testimony was not without contradiction, but the jury had the right to accept it as true. The plaintiff testified to an agreement between the parties to form the partnership; also to an agreement between himself as vendor and the defendants as vendees to sell to each individual interests in the property which should be employed in the partnership enterprise. The amount of the price at which the property was sold was not known, but was to be determined by taking an inventory of the goods on the basis of their cost price to plaintiff. The inventory was made, and showed a stated amount. Under the terms of the agreement between plaintiff and defendants, Jordan was to take the inventory, as representing himself and as agent for Stephens, and afterwards should conduct the store for the partnership. In such capacity Jordan made the inventory and proceeded to carry on the business for the firm, and continued to operate the store for the space of two months. Stephens did not during that time repudiate the sale; but on the contrary, when Jordan was about to abandon the business, Stephens told Cook that he "would carry out his contract." In these circumstances the jury was authorized to find that Stephens had authorized Jordan to represent him in making the inventory which should fix the amount of the purchase-price, and that after Jordan had acted under such authority Stephens ratified his action in mak-

ing the inventory which under the agreement should fix the price to be paid, and afterwards recognized the alleged contract of sale as a valid and binding contract. When viewed in this light, it can not be said that any contention set forth in the amendment to the motion for a new trial was well founded. The verdict was authorized by the evidence, and there was no error in refusing a new trial.          *Judgment affirmed. All the Justices concur.*